JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 00 C 4989 | DATE | 7/23/2002 |
| CASE TITLE | James P. Graham vs. Interstate Brands Corporation | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion And Order. Defendant's motion for summary judgment (46-1) is granted. Judgment is entered in favor of Defendant Interstate Brands Corporation and against Plaintiff James P. Graham.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | 4 number of notices | |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | JUL 24 2002 date docketed | 59 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | CDY docketing deputy initials | |
| | Mail AO 450 form. | | |
| ✓ | Copy to judge/magistrate judge. | 7/23/2002 date mailed notice | |
| ETV | courtroom deputy's initials | Date/time received in central Clerk's Office | ETV mailing deputy initials |

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES P. GRAHAM, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 00 C 4989 |
| ) | |
| INTERSTATE BRANDS CORPORATION, ) | Judge Rebecca R. Pallmeyer |
| ) | |
| Defendant. ) | |

### MEMORANDUM OPINION AND ORDER

**DOCKETED**

JUL 2 4 2002

Plaintiff James Graham brings this action against his employer, Defendant Interstate Brands Corporation ("IBC"). Graham, an African American, alleges that IBC violated both the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("ADA") and 42 U.S.C. § 1981 by failing to observe its usual notification and paperwork procedures prior to a medical examination, demoting him, refusing to allow him to resume his old position after circumstances changed, failing to promote him to a different position, and requiring him to wear a protective safety vest and baseball cap with the IBC logo. IBC now moves for summary judgment on each of Graham's claims. For the reasons given below, Defendant's motion is granted.

### FACTUAL BACKGROUND

Defendant IBC, a Delaware corporation, owns and operates a bakery in Hodgkins, Illinois, where it produces bread and cake products for distribution to retail stores. (Plaintiff's Deposition ("Pl.'s Dep."), at 16-17; Defendant's Statement of Facts in Support of Motion for Summary Judgment ¶ 3.) In 1979, IBC's predecessor company hired Plaintiff as a transport driver. (Pl.'s Dep., at 23, 25, 100.) In this capacity, Plaintiff drove, loaded, and unloaded trucks for IBC at various sales depots from April 1979 until March 1999, and then again from April 1999 to July 1999. (Pl.'s Dep., at 23, 25, 100.) Defendant's Distribution Manager and Human Resources Manager both testified that they considered Plaintiff a conscientious employee who has been diligent,



competent, and loyal to the company. (November 26, 2001 Deposition of Kevin Glenn ("Glenn Dep."), IBC Distribution Manager, Tab D to D.'s SJ Mot., at 16, 63; November 26, 2001 Deposition of IBC Human Resources Manager Nancy Stopka ("Stopka Dep."), Tab C to D.'s SJ Mot., at 85.) Since August 11, 1999, when Plaintiff was medically disqualified from working as a transport driver, he has been employed in a newly-created full-time position as "spotter," with the responsibility of securing loads in IBC trailers and positioning trailers so that they can be taken by IBC's transport drivers to sales depots. (Pl.'s Dep., at 16-18, 22, 64.) At all relevant times, Plaintiff has been a member of the International Brotherhood of Teamsters, Local 734 ("the Union"). (Pl.'s Dep., at 23.) A collective bargaining agreement ("the Agreement") between the Union and IBC controls the terms and conditions of Plaintiff's employment. (Pl.'s Dep., at 22-23, 26-28; Nov. 9, 1997-Nov. 9, 2002 Bread and Cake Drivers Agreement, Exhibit 1 to Defendant's Motion for Summary Judgment ("D.'s SJ Mot.").)

On March 15, 1999, Plaintiff failed a medical examination when IBC's company physician measured his blood pressure as 190 systolic/124 diastolic, 190/110, and 188/110. (Pl.'s Dep., at 118-119.) The Department of Transportation ("DOT")'s Federal Motor Carrier Safety Regulations ("FMCSR") provide that an individual is physically qualified to drive a commercial motor vehicle only if that person "[h]as no current clinical diagnosis of high blood pressure likely to interfere with his/her ability to operate a motor vehicle safely." (49 C.F.R. § 391.41(b)(6).) Pursuant to the FMCSR, the Office of Motor Carrier Research issued "Medical Advisory Criteria for Evaluation Under 49 C.F.R. part 391.41." (Pl.'s Dep., at 96-97; Medical Advisory Criteria ("Advisory Crit.") for Evaluation Under 49 C.F.R. part 391.41, Exhibit 12 to D.'s SJ Mot.) Under those criteria, Plaintiff's blood pressure exceeded the limits for commercial drivers:

> Moderate to Severe Hypertension is considered an initial BP [blood pressure] of 161-180 systolic and/or 91-104 diastolic.
>
> 1. The driver should not be qualified, until the BP has been reduced to less than 181/105.

2

2. Once the individual's BP is below and/or 105, the driver must be issued <u>one</u> 3-month certificate. During this 3-month period, the BP must be reduced to less than or equal to 160/90.
3. If at any time during or by the end of this 3-month period the BP is found to be less than or equal to 160/90, a medical certificate may be issued for a 6-month period. However, the BP must be confirmed the third month of this 6-month period.
4. For initial BP greater than 180 and/or 104, documentation of continued control and recertification should be made every 6 months.[1]

(Advisory Crit., at § 391.41(b)(6).) (emphasis in original).

Under its agreement with the Union, IBC must abide by all DOT rules and regulations, including the FMCSR. (Pl.'s Dep., at 31; Agreement, Article II, Section 12(f): "It is understood that the Employer will abide by all rules and regulations of the Department of Transportation."; 49 C.F.R. § 391.41 et seq.) IBC's transport drivers must comply with DOT regulations regarding physical qualifications to drive (Pl.'s Dep., at 93-95), and the company physician periodically evaluates IBC drivers to determine whether they are in compliance with the regulations. (Plaintiff's Response to Defendant's Statement of Facts in Support of Motion for Summary Judgment ("Pl.'s 56 Resp.") ¶ 13; 49 C.F.R. § 393 (f), (g).) If the company physician determines that a transport driver is physically qualified to drive, the physician issues the driver a Department of Transportation Medical Examiner's Certificate ("DOTMEC") specifying the period for which the driver is qualified. (49 C.F.R. § 393 (f), (g).) Plaintiff acknowledges that compliance with the FMCSR was a condition of his employment as transport driver for IBC (Pl.'s Dep. at 52, 58) and that he could not continue in that position without a valid DOTMEC. (Pl.'s Dep., at 52-53.)

After failing the March 15, 1999 exam, Plaintiff took off from work until April 16, 1999, in an effort to reduce his blood pressure to an acceptable range. (Pl.'s Dep., at 118-120, 127; April 1,

---

[1] The Medical Advisory Criteria provide that a "medical examiner may, but is not required to, accept the [Criteria's] recommendations" and note that the FMCSR "allows employers to have more stringent medical requirements." The Office of Motor Carrier Research, which formerly issued the Criteria, is now the Bus and Truck Standards Operations Office, a part of the federal DOT's Federal Motor Carrier Safety Administration.

3

2. Once the individual's BP is below and/or 105, the driver must be issued <u>one</u> 3-month certificate. During this 3-month period, the BP must be reduced to less than or equal to 160/90.
3. If at any time during or by the end of this 3-month period the BP is found to be less than or equal to 160/90, a medical certificate may be issued for a 6-month period. However, the BP must be confirmed the third month of this 6-month period.
4. For initial BP greater than 180 and/or 104, documentation of continued control and recertification should be made every 6 months.[1]

(Advisory Crit., at § 391.41(b)(6).) (emphasis in original).

Under its agreement with the Union, IBC must abide by all DOT rules and regulations, including the FMCSR. (Pl.'s Dep., at 31; Agreement, Article II, Section 12(f): "It is understood that the Employer will abide by all rules and regulations of the Department of Transportation."; 49 C.F.R. § 391.41 et seq.) IBC's transport drivers must comply with DOT regulations regarding physical qualifications to drive (Pl.'s Dep., at 93-95), and the company physician periodically evaluates IBC drivers to determine whether they are in compliance with the regulations. (Plaintiff's Response to Defendant's Statement of Facts in Support of Motion for Summary Judgment ("Pl.'s 56 Resp.") ¶ 13; 49 C.F.R. § 393 (f), (g).) If the company physician determines that a transport driver is physically qualified to drive, the physician issues the driver a Department of Transportation Medical Examiner's Certificate ("DOTMEC") specifying the period for which the driver is qualified. (49 C.F.R. § 393 (f), (g).) Plaintiff acknowledges that compliance with the FMCSR was a condition of his employment as transport driver for IBC (Pl.'s Dep. at 52, 58) and that he could not continue in that position without a valid DOTMEC. (Pl.'s Dep., at 52-53.)

After failing the March 15, 1999 exam, Plaintiff took off from work until April 16, 1999, in an effort to reduce his blood pressure to an acceptable range. (Pl.'s Dep., at 118-120, 127; April 1,

---

[1] The Medical Advisory Criteria provide that a "medical examiner may, but is not required to, accept the [Criteria's] recommendations" and note that the FMCSR "allows employers to have more stringent medical requirements." The Office of Motor Carrier Research, which formerly issued the Criteria, is now the Bus and Truck Standards Operations Office, a part of the federal DOT's Federal Motor Carrier Safety Administration.

1999 Follow-up Visit Medical Record prepared by Dr. Rakesh Chugh, Exhibit 20 to D.'s SJ Mot.)[2] On April 16, 1999, Plaintiff returned to the company physician for examination, and his blood pressure was measured at 160/88 and 160/90, both acceptable readings under the FMCSR. (Pl.'s Dep., at 121; Physical Examination Report and Physical Examination Record prepared by Dr. Hardeep Arora, Exhibit 17 to D.'s SJ Mot.) Pursuant to the regulations, IBC's physician gave Plaintiff a three-month DOTMEC which expired on July 16, 1999. (*Id.*) Between April 16 and July 16, 1999, Plaintiff resumed his work as a transport driver, with the understanding that to maintain the position he would need an acceptable blood pressure reading when the company physician reexamined him in July 1999. (Pl.'s Dep., at 122-23.)

Plaintiff visited IBC's doctor on July 19, 1999, three days after the date his DOTMEC expired. (Pl.'s Dep., at 124, 130.) Plaintiff alleges that in June and July 1999, IBC discriminated against him because of race and disability by failing to notify him that his DOTMEC was scheduled to expire, failing to give him the necessary authorization and form papers, and failing to notify him that it was time to complete his DOT physical. (Plaintiff's First Amended Complaint ("Complaint") ¶ 23.) Plaintiff alleges further that in July 1999, IBC failed to schedule his DOT physical before his DOT certification expired. (Complaint ¶¶ 24-25.) Plaintiff concedes, however, that he knew that after obtaining a three-month DOTMEC in April 1999, he had to return to the company physician three months later and pass a DOT physical. (Pl.'s Dep., at 122-23.) In his Amended Complaint, Plaintiff alleged that it was IBC's routine practice to schedule DOT physicals for its transport drivers (Complaint ¶ 22), but he later acknowledged at his deposition that it was the driver's responsibility to schedule his DOT physical with the company physician. (Pl.'s Dep., at 109.) Plaintiff also testified that his copy of the DOTMEC was "blurred," causing him to mistake June 16 expiration

---

[2] The parties do not dispute the dates or duration of this hiatus from Plaintiff's work. The court notes in passing that Dr. Chugh's April 1, 1999 record states that Plaintiff "has been off work for almost one week," which suggests that either Dr. Chugh was in error or Plaintiff's time off began more than a week after the March 15 date of his initial medical examination.

4

date for June 19. (Pl.'s Dep., at 123, 124, 130.)

At the July 19, 1999 examination, the company physician found that Plaintiff's blood pressure was 190 over 110, too high to meet the DOT standards. (Pl.'s Dep., at 125-27; "BP for James Graham" Table, Exhibit 16 to D.'s SJ Mot.) Plaintiff testified that he believed the company would have allowed him to continue driving for them if he had passed his physical exam. (Pl.'s Dep., at 133.) On July 27, 1999, Plaintiff received a prescription form from his personal physician, Dr. Raja P. Gowda, stating that Plaintiff's blood pressure was 130/80. (Pl.'s Dep., at 140; Dr. Raja P. Gowda Medical Form of 7/27/1999, Exhibit 21 to D.'s SJ Mot.) Plaintiff presented this slip to IBC. (Pl.'s Dep., at 140-141.) Neither Dr. Gowda nor anyone else issued a DOTMEC to Plaintiff between July 1999 and July 2000, however. (Pl.'s Dep., at 142-43.)

DOT regulations establish a procedure to resolve conflicts of medical evaluation regarding a driver's fitness to drive. 49 C.F.R. § 391.47. This procedure requires a driver to submit an application to the Federal Motor Carrier Safety Administration that includes, among other things, proof that the physicians for the driver and his motor carrier disagree about his qualifications. 49 C.F.R. § 391.47(b). Plaintiff testified that he never sought a resolution of the conflict between his different medical evaluations. (Pl.'s Dep., at 144.) Plaintiff explained that he believed there had been no conflict between his private physician and the company physician who referred him to the private physician for adjustment of his medication. (Pl.'s Dep., at 144-45.)

On August 11, 1999, Plaintiff, Defendant, and the Union entered into a letter of agreement that removed Plaintiff from the position of transport driver and created a position for him as a "spotter," a position he continues to fill. (Pl.'s Dep., at 22, 65; Letter of Agreement of 8/11/99, Exhibit 11 to D.'s SJ Mot.) Under the CBA, the spotter position pays $2 per hour less than the transport driver position. (CBA, Article 2, Section 12.) The letter of agreement provided in part that

> On July 19, [Plaintiff] was unable to qualify for a renewal or extension of his DOT certification, and is therefore unable to qualify to perform as a Transport Driver under DOT regulations. It is acknowledged that under these circumstances, the

5

> Company could terminate Graham's employment.
> The Company will create a Spotter position, which currently does not exist, and will assign Graham to that position immediately. Graham will be paid at the Spotter classification rate found in [the CBA].

(Pl.'s Dep., at 70-71; Letter of Agreement.) Although the spotter position is identified in the CBA, IBC had not employed any employee as a full-time spotter before Plaintiff. (Glenn Dep., at 30-31.)

Plaintiff understood that under the CBA, he could file grievances about work-related issues, including race or disability discrimination. (Pl.'s Dep., at 32-33.) Plaintiff has never filed grievances alleging race or disability discrimination and has never asked the Union to file such a grievance on his behalf. (Pl.'s Dep., at 33, 35.) On August 23, 1999, twelve days after signing the Letter of Agreement, Plaintiff filed a grievance with the Union seeking vacation pay because he received a lower vacation pay rate in the spotter position than he had in his transport driver position. (Pl.'s Dep., at 38-39; 8/23/99 Grievance Form on behalf of James Graham ("Grievance Form"), Exhibit 3 to D.'s SJ Mot.) This is the only grievance that Plaintiff has filed with the Union since his move to the spotter position (Pl.'s Dep., at 40; Stopka Dep., at 42-43; Glenn Dep., at 65), and it does not seek his return to the transport driver position or make any allegations related to his move from driver to spotter. (Pl.'s Dep., at 38-39; Grievance Form.)

On September 24, 1999, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC Charge"), alleging that IBC discriminated against him and demoted him on the basis of disability. (Pl.'s Dep., at 152-53; James P. Graham EEOC Charge of 10/24/00 ("EEOC Charge"), Exhibit 23 to D.'s SJ Mot.) In his EEOC Charge, Plaintiff alleged that he was disabled, stating that he "was unable to pass Respondent's DOT physical examination due to [his] disability." (Pl.'s Dep., at 152; EEOC Charge.) Plaintiff subsequently testified that he is not disabled, however, and did not consider himself to be disabled when he filed his EEOC Charge. (Pl.'s Dep., at 155-56.) Plaintiff did not allege discrimination on the basis of race in his EEOC Charge. (Pl.'s Dep., at 153; EEOC Charge.) The EEOC issued a notice of right

6

to sue to Plaintiff on June 28, 2000. (Notice of Right to Sue, Exhibit A to Plaintiff's Amended Complaint of January 5, 2001("Complaint"), Docket No. 25.)

At an unspecified date in 2000, Plaintiff obtained a DOTMEC from his personal physician and submitted it to IBC.[3] (Pl.'s Dep., at 151; Doctor R. Chugh Medical Certification Form, expiring 7/5/01, Exhibit 25 to D.'s SJ Motion.) After Plaintiff provided IBC with additional information and the 2000 DOTMEC, IBC did not ask him about his doctor's credentials, reinstate him to his driver position, restore his pay to its former level, or hold any further meetings. (Pl.'s Dep., at 235-36.) IBC accepts DOTMEC certificates only from its company physicians, Work Right;[4] in fact, IBC officer Stopka testified that even if an employee is DOTMEC certified by another qualified physician, IBC will not accept the DOTMEC. (Stopka Dep., at 54-55.) Stopka is not aware of any written company policy or directive on this issue. (Stopka Dep., at 55-56.)

Plaintiff alleges that in contrast to its treatment of him in 2000, IBC has allowed employees Dennis Garmon and Robert Rogers to take DOT physicals after the expiration of their DOTMECs. Plaintiff acknowledges that both Garmon and Rogers are African Americans. (Pl.'s Dep., at 59-60, 222; Plaintiff's Answers to Defendant's First Interrogatories ¶ 7(b).) Neither Garmon nor Rogers has ever been deemed physically unable to drive a transport vehicle for IBC because of high blood pressure or any other condition. (Stopka Dep., at 75-76; Declaration of Nancy Stopka in Support of IBC's Motion for Summary Judgment ("Stopka Decl."), Tab E to D.'s SJ Mot. ¶ 9.) Plaintiff also alleges that Clem Macis and Andy Nisbet, two Caucasian drivers who suffered from high blood

---

[3] As noted, the record does not indicate what day Plaintiff obtained the form from Dr. Chugh. The DOTMEC expires on July 5, 2001, however, and the court infers that Dr. Chugh may have understood the DOTMEC to be valid for one year when he prepared it. The parties disagree concerning the manner in which Plaintiff submitted the 2000 DOTMEC to IBC: Plaintiff alleges that he gave the form to Glenn (Pl.'s Dep., at 151), while Defendant contends that Plaintiff gave the form to Nancy Stopka. (Stopka Dep., at 73-74.)

[4] Work Right is a medical organization that IBC uses for all its DOT exams. (Stopka Dep., at 47.)

7

pressure, received different treatment from IBC than he did. (Pl.'s Dep., at 226-27.) Plaintiff admits that Macis "was able to get his blood pressure under control before the physical expired."[5] (Pl.'s Dep., at 227.) Nisbet, in contrast, failed his first physical examination but passed his second. (Pl.'s Dep., at 227-28.) In other words, Nisbet, unlike Plaintiff, did not fail a DOT physical examination at the conclusion of a three-month temporary DOTMEC. (Stopka Decl. ¶ 8.) IBC is not aware of any IBC transport driver who, like Plaintiff, failed the DOT physical because of high blood pressure, received a three-month DOTMEC, and again failed the DOT physical because of high blood pressure. (Stopka Decl. ¶ 8.)

After receiving the right-to-sue letter that the EEOC sent on June 28, 2000, Plaintiff filed a *pro se* discrimination complaint in this court on August 15, 2000, alleging that IBC discriminated against him on the grounds of disability by unfairly demoting him to the spotter position and by failing to accommodate his disability. (Pl.'s Dep., at 161; Complaint of 8/15/00 ("*Pro Se* Complaint"), Exhibit 25 to D.'s SJ Mot.) Plaintiff's complaint did not allege race discrimination.[6] (Pl.'s Dep., at 162-163; *Pro Se* Complaint.) On January 5, 2001, with the assistance of counsel, Plaintiff filed an amended complaint alleging that IBC had both violated the ADA by erroneously regarding him as disabled and violated 42 U.S.C. § 1981 by discriminating against him on the basis of his race. (Complaint.) In support of his claim that IBC regarded him as disabled, Plaintiff noted in his deposition that IBC moved him from the transport driver position to the spotter position, and that the company had perceived him as unable to perform the one specific job of transport driving. (Pl.'s Dep. at 157-58 ("I was perceived to be disabled because of being taken off the job".).)

On November 17, 1999, IBC promoted Jay Swanson, a Caucasian, to the position of "lead

---

[5] The court infers that Plaintiff meant that Macis reduced his blood pressure to acceptable limits before his DOTMEC expired and thus never failed a physical.

[6] Question 9 on the Complaint form used by Plaintiff directs filers to "check all [boxes]" that describe defendant's alleged discrimination, and provides boxes for discrimination by age, color, disability, national origin, race, religion, and sex. (*Pro Se* Complaint.)

8

man" or "group leader." (Jay Swanson Employee Record Notification of 11/17/99 ("Swanson Record"), Exhibit 28 to D.'s SJ Mot.) This position requires an employee to train new transport drivers, perform time studies on runs, and perform the job of a transport driver, all tasks which require a DOTMEC. (Pl.'s Dep., at 205-08; Glenn Dep., at 55-56.) The group leader position pays 50 cents per hour more than the transport driver position. (Swanson Record.) Plaintiff agrees that it is appropriate for IBC to consider whether applicants have a current driver's certification to drive a commercial motor vehicle in making promotions to group leader. (Pl.'s Dep., at 208.) On the day IBC promoted Jay Swanson to group leader, he had a valid DOTMEC and was qualified to drive under DOT regulations (Stopka Decl. ¶ 11); on the same date Plaintiff lacked a DOTMEC and was therefore not qualified to drive under the regulations. (Pl.'s Dep., at 142-43; 208, 221.)

IBC Distribution Manager Kevin Glenn testified that he determined that Swanson was the most qualified for the group leader position based on his interview; knowledge of transport, shipping, and computers; flexibility; and interest in learning about the business. (Glen Dep., at 45-46, 52, 56.) Plaintiff alleges that these are pretextual bases for Glenn's decision. Plaintiff alleges that Glenn did not even consider him for the position (Glenn Dep., at 52-55; Plaintiff's Additional Statement of Facts in Opposition to Defendant's Motion for Summary Judgment ("Pl.'s 56") ¶ 6); Defendant notes that Glenn recalled looking "at the entire department" and "kind of whittl[ing] it down as to who we thought was qualified or best suited and showed the most interest or had the drive for it." (Glenn Dep., at 55; Defendant's Reply to Plaintiff's Additional Statement of Facts ("D.'s 56 Reply") ¶ 6). Plaintiff, who at the time was working as a spotter, never expressed interest in the position to Glenn.[7] (Glenn Dep., at 55.)

---

[7] Defendant's Rule 56 Statement ¶ 79 states in part that "[Plaintiff] did not express interest in the position." Plaintiff's Rule 56 response "Denied in part" this statement of fact. Because this vague, unsupported response violates Local Rule 56.1(b)(3)((A)'s requirement that parties opposing summary judgment submit "specific references to the affidavits, parts of the record, and other supporting materials relied upon," the court will accept Defendant's statement
(continued...)

9

Plaintiff testified that he was more qualified for the position than Swanson "because there was nothing other than having a [medical examiner's] card that he could do that I couldn't do. And I had the years as far as seniority." (Pl.'s Dep., at 208.) According to Plaintiff, Swanson had been employed by IBC for less than a year at the time he was promoted to group leader for the transport department. (Pl.'s Dep., at 221.) In fact, IBC offered evidence that it hired Swanson in August 1993 to work as a transport driver at another IBC facility before he began to work as a transport driver at the company's Hodgkins, Illinois facility on January 2, 1998. (Stopka Decl. ¶ 12; Pl.'s Dep., at 207-08.) Plaintiff concedes that seniority should not be the only determining consideration in making a promotion decision (Pl.'s Dep., at 208), and that there are two Caucasian IBC transport drivers senior to him who have not been promoted to group leader. (Pl.'s Dep., at 200-01.)

Plaintiff alleges that because of his race, his supervisors require him to wear a special hat and special safety vest while he is performing the normal duties of his spotter position. (Complaint ¶¶ 49-50.) Plaintiff's supervisor denied that Plaintiff was required to wear either piece of clothing. (Glenn Dep., at 33-34.) As noted previously, Plaintiff acknowledges that he is the only person employed at IBC as a full-time spotter. (Pl.'s Dep., at 75, 92, 198.) Plaintiff also admits that the "special vest" referred to in his amended complaint is a protective safety vest (Pl.'s Dep., at 192-93), and testified that he "can understand" that wearing a safety vest is an appropriate safety precaution for a spotter at IBC's bakery. (Pl.'s Dep., at 198.) Plaintiff does not like wearing the safety vest because African American and Caucasian transport drivers who occasionally perform spotting duties do not wear safety vests when they are spotting. (Pl.'s Dep., at 199.) Plaintiff admits that the "special hat" referred to in his Amended Complaint is a baseball cap with the IBC

---

¹(...continued)
as true. See Local Rule 56.1(b)(3)(B) ("All material facts set forth in the statement required of the [party seeking summary judgment] will be deemed to be admitted unless controverted by the statement of the opposing party."); *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 870 n.3 (7th Cir. 2000).

10

logo on it, and that IBC gave him the hat to wear instead of his own "New Orleans" baseball cap. (Pl.'s Dep., at 191-92.)

## DISCUSSION

### A.  Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. FED.R.CIV.P. 56(c); *see also Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 709 (7th Cir. 2002). In determining the existence of material facts, the court must examine the evidence and draw all reasonable inferences in the light most favorable to the nonmoving party. *Id.* An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 677 (7th Cir. 2001). The Seventh Circuit has noted that "courts should be careful in a discrimination case . . . not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be." *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997). Nonetheless, even when issues of motive and intent are involved, summary judgment may be appropriate if the plaintiff fails to present evidence demonstrating the alleged motive of intent to discriminate. *See Cliff v. Board of Sch. Comm'rs*, 42 F.3d 403, 409 (7th Cir. 1994); *see also Alexander v. Wisconsin Dept. of Health and Family Servs.*, 263 F.3d 673, 680 (7th Cir. 2001).

Plaintiff alleges that IBC violated the ADA by discriminating against him on the basis of a perceived disability and violated 42 U.S.C. § 1981 by discriminating against him on the basis of race. He claims IBC acted unlawfully when it neglected to follow its usual notification and paperwork procedures prior to his July 1999 DOT medical testing; demoted him from his transport driver position to his current spotter position; and refused to allow him to resume his transport

11

driver position after Plaintiff's personal physician certified that his blood pressure had returned to levels suitable for DOT certification. Plaintiff alleges further that IBC has discriminated against him on the basis of race by subjecting him to disparate treatment in requiring him to wear a special hat and vest while performing his normal duties as a spotter, and in failing to promote him to the position of group leader.

### B.     Disability Discrimination Claims

To establish disability discrimination, Plaintiff must show that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job either with or without reasonable accommodation; and (3) he has suffered from an adverse employment decision because of his disability. *Dvorak v. Mostardi Platt Assocs.*, 289 F.3d 479, 483 (7th Cir. 2002). Plaintiff's "threshold burden" is to establish that he is disabled as that term is defined in the ADA. *Moore v. J.B. Hunt Transp., Inc.*, 221 F.3d 944, 950 (7th Cir. 2000).

The ADA's definition of disability encompasses a "physical or mental impairment that substantially limits one or more of the major life activities," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(2); *Dvorak*, 289 F.3d at 483. Major life activities include "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i); *Furnish v. SVI Sys., Inc.*, 270 F.3d 445, 449 (7th Cir. 2001).

Because Plaintiff concedes that he is not disabled and did not consider himself disabled at the time when he filed his EEOC charge (Pl.'s Dep., at 155-56) and does not address a record of impairment, he must show that IBC regarded him as having an impairment. Under Supreme Court precedent, a person is "regarded as" disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities. *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999); *see also Nawrot v.*

12

CPC Intern., 277 F.3d 896, 903 n.1 (7th Cir. 2002).

As Defendant notes, in *Murphy v. United Parcel Serv., Inc.*, the Supreme Court addressed a case quite similar to the one currently before this court. 527 U.S. 516 (1999). In *Murphy*, the petitioner brought an ADA action against an employer that terminated him after his high blood pressure prevented him from obtaining the DOT certification required for driving commercial vehicles. In that case, as here, the employee sought to survive summary judgment by arguing that the employer's action demonstrated that it regarded him as substantially limited in the major life activity of working. In affirming summary judgment for the employer, the *Murphy* court ruled on two issues central to this case. First, the court determined that "to be regarded as substantially limited in the major life activity of working, one must be regarded as precluded from more than a particular job." *Id.* at 523, *citing* 29 C.F.R. 1630.2(j)(3)(i) ("The inability to perform a single particular job does not constitute a substantial limitation on the major life activity of working."). Second, the court concluded that evidence showing that the employee was regarded as unable to obtain DOT certification was insufficient to create a genuine issue of material fact as to whether he was regarded as substantially limited in one or more major life activities. *Murphy*, 527 U.S. at 523-24.

*Murphy* controls this case and requires summary judgment in favor of IBC on Plaintiff's ADA claims. Simply put, Plaintiff has failed to demonstrate that he is protected by the ADA. Indeed, Plaintiff's claims are even weaker than the ADA claims the Supreme Court rejected in *Murphy*. In the case at hand, IBC specifically demonstrated its perception that Plaintiff could continue to work by offering him another position, even though both *Murphy* and the Letter of Agreement suggest that IBC could simply have terminated Plaintiff for his inability to meet with DOT requirements. It follows that whether IBC acted reasonably or not in refusing to consider the DOTMEC Plaintiff obtained from his own doctor in 2000, the corporation never "regarded" Plaintiff as disabled in a way that would trigger the ADA. Because of its disposition of these claims, the court need not reach Defendant's arguments that Plaintiff's ADA claims are barred by the August 11, 1999 Letter

13

of Agreement and by Plaintiff's failure to exhaust the administrative procedures of the Federal Motor Carrier regulations.

## C. Racial Discrimination Claims

Plaintiff alleges that IBC discriminated against him on the basis of his race in three ways: by requiring him to wear a protective safety vest and cap, by failing to promote him to the group leader position, and by refusing to restore him to the transport position. As explained below, none of these claims has merit.

### 1. Protective safety vest and cap

First, Plaintiff cannot show that IBC acted unlawfully in requiring him to wear a safety vest and cap for two reasons. First, while Defendant argues that it has imposed no clothing requirement at all, even being required to wear a safety vest or company baseball hat instead of one's own hat does not rise to the level of an adverse employment action. *See McPhaul v. Board of Comm'rs of Madison County*, 226 F.3d 558, 566 (7th Cir. 2000) (no adverse employment action in prohibiting African American employee from wearing uniform while allowing Caucasian employee to wear uniform). As the Seventh Circuit has noted, "not everything that makes an employee unhappy is an adverse action." *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir. 1996). In order to constitute a materially adverse change in the terms and conditions of employment, the action must be more disruptive than a mere inconvenience or an alteration of job responsibilities, *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir.1993), and must have some tangible job consequence, *see Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998), such as termination of employment; demotion evidenced by a decrease in wage or salary, or a less distinguished title; a material loss of employment benefits; or significantly diminished material responsibilities. *See Crady*, 993 F.2d at 136. The clothing requirement here does not qualify.

Nor can Plaintiff show that similarly situated employees outside his protected class were

treated differently than he has been. To begin, it appears that there are no other employees situated similarly to Plaintiff: he admits that he is the only full-time spotter employed by IBC. Even contrasting Plaintiff's treatment to that received by transport drivers who occasionally perform spotter work is illustrative, however. As Plaintiff himself concedes, neither Caucasian nor African American transport drivers who do spotting work are required to wear safety vests or the IBC baseball hat that he objects to. The logical inference from this evidence is that IBC's alleged wardrobe requirements derive not from racial bias, but from a decision that full-time spotters should be treated differently than those who do the work occasionally. Accordingly, the court grants Defendant summary judgment on this issue.

### b. Failure to Promote

In order to establish a prima facie case of racial discrimination with regard to IBC's failure to promote him, Plaintiff must show that (1) he belongs to a racial minority; (2) he applied and was qualified for a job for which IBC was seeking applicants; (3) despite his qualifications, he was rejected; and (4) the position was given to someone of different race who had similar or different qualifications. *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000).

Plaintiff has not met his burden. To begin, there is no evidence on the record permitting an inference that he ever applied for the group leader position. Plaintiff has not submitted a copy of any application for the job, for example, or highlighted any relevant testimony on point in his deposition. More importantly, in light of the informality with which IBC approached the promotion decision, Plaintiff has not challenged his supervisor's testimony that Plaintiff never expressed an interest in the new position. In short, from the evidence before the court, it is not clear how the company or the people making the promotion decision could possibly have known that Plaintiff sought the new position.

In addition, Plaintiff has failed to demonstrate that he was qualified to fill the new position.

It is undisputed that in November 1999, the time that Swanson received the group leader position, Plaintiff had no DOTMEC and could not legally drive IBC's commercial trucks on the roads. Yet the position included several responsibilities incorporating such driving, including training new transport drivers, performing time studies on runs, and acting as a transport driver. Plaintiff himself concedes that it was appropriate for IBC to consider whether applicants for the group leader position had current driver's certifications. Drawing all reasonable inferences in favor of Plaintiff, therefore, it would be impossible to say either that Plaintiff was qualified at all to lead IBC's transport drivers or that he was as qualified or more qualified than Swanson, who did have the requisite DOTMEC. In light of these conclusions, the court need not reach Defendant's arguments that Plaintiff lacks evidence showing that the promotion of Swanson was a pretext for racial discrimination. IBC is entitled to summary judgment on Plaintiff's failure to promote claim.

### c. The Spotter Position

Plaintiff also alleges that IBC's creation of the spotter position for him and the company's subsequent refusal to reconsider him for a transport driver position after he received a DOTMEC certification in 2000 are acts of racial discrimination in violation of 42 U.S.C. § 1981. Here, too, Plaintiff has failed to make a prima facie case, because he has failed to present any evidence regarding similarly situated employees of different races. *See Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000) ("plaintiff must show that the 'comparables' are similarly situated *in all respects*") (emphasis in original). Plaintiff has not presented evidence relating to any other IBC employee who was deemed unable to drive after failing a DOT physical, and there is no evidence on the record pertaining to IBC employees seeking to regain old positions after beginning new full-time positions at the corporation. To his credit, Plaintiff's counsel has candidly admitted the evidentiary shortcomings of this aspect of the case. *See* Plaintiff's Memorandum Brief in Opposition to Defendant's Memorandum in Support of Summary Judgment, at 11 (with regard to

Plaintiff's spotter-related § 1981 claims, "[a]n examination of the personnel and DOT files of transport drivers for three years has not disclosed the existence of a situation similar to that of Graham"). Accordingly, the court grants Defendant summary judgment on Plaintiff's § 1981 claims related to the creation of the spotter position and the refusal to consider moving Plaintiff out of it.

Finally, Plaintiff alleges that Defendant violated § 1981 by failing to send him the proper paperwork and notifications in preparation for the physical he was scheduled to take on July 16, 1999 but eventually took on July 19, 1999. Plaintiff has failed to show how these alleged oversights were in any way materially adverse to him. He took the physical three days later than scheduled and has not alleged that the delay in any way caused his failure. He has also failed to adduce any evidence that similarly situated employees of different ethnicities were treated differently. Accordingly, the court grants Defendant summary judgment on this final part of Plaintiff's § 1981 claim.

## CONCLUSION

For the reasons stated above, IBC's summary judgment motion (Doc. No. 46-1) is granted.

ENTER:

Dated: July 23, 2002

REBECCA R. PALLMEYER
United States District Judge

